**Electronically Filed
Supreme Court
SCWC-12-0001011
21-JUN-2016
09:56 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee,

vs.

GREGORY A. KAZANAS, Petitioner/Defendant-Appellant.

_____

SCWC-12-0001011

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0001011; CR. NO. 11-1-1592)

JUNE 21, 2016

McKENNA, POLLACK, AND WILSON, JJ.,
WITH NAKAYAMA, J., DISSENTING, WITH WHOM RECKTENWALD, C.J.,
JOINS

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

This month marks the fiftieth anniversary of the United States Supreme Court's landmark decision, Miranda v. Arizona, 384 U.S. 436 (1966).  In that case, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a]

defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. The Court envisioned the following procedural safeguard: "Prior to any questioning, the person must be warned that he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed." Id.

The Miranda advisement provides "concrete constitutional guidelines for law enforcement agencies and courts to follow." 384 U.S. at 442. At the time the Court announced the Miranda rule, it had become increasingly alarmed by the psychologically coercive nature of police interrogations. 384 U.S. at 448 ("[C]oercion can be mental as well as physical . . . [T]he blood of the accused is not the only hallmark of an unconstitutional inquisition.") (citing Blackburn v. Alabama, 361 U.S. 199, 206 (1960)). Although none of the petitioners in the Miranda case was the victim of "overt physical coercion or patent psychological ploys," the Court was nonetheless concerned that the police officers who questioned the petitioners did not "undertake to afford appropriate safeguards at the outset of the interrogation to insure that the statements were truly the product of free choice." 384 U.S. at 457.

In this appeal, we decide whether an arrestee not advised of his <u>Miranda</u> rights was "interrogated" in the constitutional sense. Briefly stated, Petitioner/Defendant-Appellant Gregory Kazanas ("Kazanas") was charged with one count of Criminal Property Damage in the First Degree and one count of Unauthorized Entry into Motor Vehicle in the First Degree ("UEMV"). The charges stemmed from events alleged to have taken place on Halloween 2011. Kazanas was accused of breaking the back windshield of a car then reaching through the driver's side open window to punch the driver in the face. Kazanas was identified by the complaining witness and arrested. The Honolulu Police Department ("HPD") police officer assigned to accompany Kazanas to Queen's Medical Center knew the reason for the arrest. In an apparent effort to make small talk and calm Kazanas down, she asked him how his Halloween went. During the conversation, Kazanas stated, "If people didn't upset me, I wouldn't have to punch them." The statement was admitted at trial, and Kazanas was ultimately convicted of UEMV.

We hold that, although the officer testified that she did not intend her small talk to provoke an incriminating response, she "should have known that her words were reasonably likely to elicit an incriminating response from the person in custody." <u>State v. Joseph</u>, 109 Hawaiʻi 482, 495, 128 P.3d 795, 808 (2006) ("Interrogation involves any practice reasonably likely to

invoke an incriminating response without regard to objective evidence of the intent of the police.").  The questioning in this case was reasonably likely to elicit an incriminating response as the events of the night culminated in Kazanas's arrest for UEMV.  The officer knew how Kazanas's Halloween went.  Thus, her question was reasonably likely to elicit from Kazanas details about the alleged crime.  In other words, the police officer subjected Kazanas, a person in custody pursuant to an arrest, to interrogation; accordingly, Kazanas was entitled to be advised of his Miranda rights before the small talk conversation began.  As Kazanas's right against self-incrimination was violated, his statement should have been suppressed at trial.

On certiorari, Kazanas also argues that the circuit court abused its discretion in admitting prior bad act evidence that Kazanas had run, jumped, and punched two people in 2007 and punched another person in the face, arms, and legs, then struck her in the face with a cane in 2006, incidents that occurred before the Halloween 2011 incident.  On certiorari, Kazanas no longer disputes that he opened the door to the admission of the evidence when he testified he was physically incapable of running, jumping, and punching ever since he sustained serious injuries in a nine-story fall from a hotel balcony in 2005.  Rather, on certiorari, Kazanas challenges the circuit court's

weighing of the evidence's probative value versus the danger of prejudice under Hawai'i Rules of Evidence ("HRE") Rule 403 (1980). We hold that the circuit court abused its discretion in admitting evidence of the 2006 prior bad acts, as only the 2007 incident was necessary to counter Kazanas's testimony, and the probative value of the 2006 acts was substantially outweighed by the danger of unfair prejudice.

In sum, the ICA erred in concluding that Kazanas's statement was not procured in violation of his <u>Miranda</u> rights and therefore admissible. The ICA also erred in concluding that the circuit court properly permitted the State to introduce evidence of Kazanas's 2006 prior bad acts. Therefore, the ICA's Judgment on Appeal and the Circuit Court of the First Circuit's[1] ("circuit court") Judgment of Conviction of Probation Sentence are vacated, and this case is remanded for a new trial.

## II. Background

### A. Indictment and Pre-Trial Motions

On November 3, 2011, Kazanas was charged by Indictment of one count of Criminal Property Damage in the First Degree, in violation of Hawai'i Revised Statutes ("HRS") § 708-820(1)(a)

---

[1]  The Honorable Rom A. Trader presided.

(2014)[2], and one count of Unauthorized Entry into Motor Vehicle in the First Degree, in violation of HRS § 708-836.5(1) (2014).[3]

Kazanas filed his Motion in Limine #1 seeking exclusion of the following evidence:

> (a) Testimonial or documentary evidence relating to the defendant's prior criminal record, including any reference to defendant's conviction and being placed on probation in CR. NO. 06-1-0995; and
> . . . .
> (c) Statements made by the defendant to Honolulu Police Officer CHRISTY-LYNN AVILLA on November 1, 1011 [sic] at approximately 0050 hours at the Queen's Medical Center. . . .

Before trial, the State filed its Notice of Intent to Use Evidence of Prior Acts. Specifically, the State sought to admit evidence of (1) a 2007 assault in the third degree conviction, stemming from an incident in which Kazanas and another person attacked two men from behind, then ran from police and jumped a fence; and (2) a 2006 abuse of family or household member conviction, stemming from an incident in which Kazanas ambushed his ex-girlfriend in her apartment; punched her on her face, arms, and legs; and struck her in the face with a cane.

---

[2] HRS § 708-820(1)(a) provides, as it did at the time of the alleged offense, "A person commits the offense of criminal property damage in the first degree if by means other than fire . . . [t]he person intentionally or knowingly damages property and thereby recklessly places another person in danger of death or bodily injury. . . ."

[3] HRS § 708-836.5(1) provides, as it did at the time of the alleged offense, "A person commits the offense of unauthorized entry into motor vehicle in the first degree if the person intentionally or knowingly enters or remains unlawfully in a motor vehicle, without being invited, licensed, or otherwise authorized to enter or remain within the vehicle, with the intent to commit a crime against a person or against property rights."

Before trial, the State also filed a Motion to Determine the Voluntariness of Defendant's Statement to the Police.  The motion sought orders from the court

> 1.  Finding and concluding that the statements made by Defendant Gregory A. Kazanas . . . to Officer Christy-Lynn Avilla . . .  on November 1, 2011, were voluntarily made.
> 2.  Prohibiting the defense from commenting upon or making reference to the substance of Defendant's statement to the police, unless the prosecution first introduces evidence of the same.

The specific statements Kazanas made to Officer Avilla were, "I wouldn't have to punch people if they didn't upset me," and "If you didn't catch me now for this, you would've caught me later for something else."

Immediately before trial, the circuit court held a hearing on the State's motion.  Officer Avilla testified as follows: She transported Kazanas to Queen's Medical Center in the early morning hours of November 1, 2011.  Kazanas was transported to the hospital because he had injuries on his right hand.  Officer Avilla told Kazanas "multiple times" that he was under arrest for UEMV, first when she handcuffed him, next during transport, and lastly at the hospital.  Although she did not inform him that he had the right to remain silent, she did tell him, upon his arrest, "that he was not allowed to talk about the case or say anything about what he had been arrested for."

She further testified that at the hospital, Kazanas began "making comments that were rude and other patients could hear

7

it. . . ."  Avilla moved Kazanas to an HPD room within the hospital.  Avilla and Kazanas sat about six feet away from each other, with Kazanas in handcuffs.  Although Officer Avilla did not detect alcohol on Kazanas's breath, his "demeanor made it seem that he was under the influence of something. . . ."

In order to "help him calm down and get his mind off of saying . . . rude things," she began asking Kazanas "questions about if he enjoyed Halloween that night, what kind of costumes did he see, but nothing along the lines in reference to the investigation. . . ."  Officer Avilla testified she did not know what his responses would be.

According to Officer Avilla, it was Kazanas who decided to "spontaneously utter[], 'If people didn't upset me, I wouldn't have to punch them.'"  She further testified that Kazanas's statement was not in response to any questions she asked him.  Although she was not sure how much time had passed between her small talk questions and his statements, Officer Avilla testified that his statements were made "just out of the blue, that was out of context of what we were talking about," referring to the conversation about Halloween and costumes.  After Kazanas made his statement, Officer Avilla told him "his case was still under investigation and to stop what he was saying, because it could be used against him in a court of law."  Kazanas then apologized; about a minute or so later, he then

stated, "If you didn't catch me now, you would have caught me for something else later."

The circuit court granted in part and denied in part the State's Motion to Determine Voluntariness of Defendant's Statement to the Police.  The court granted the motion in part, finding that "Defendant's statement to Officer Avilla, 'I wouldn't have to punch people if they didn't upset me' was a voluntary statement and is admissible."  The circuit court excluded, however, Kazanas's second statement to Officer Avilla ("If you didn't catch me now for this, you would have caught me later for something else"); the circuit court reasoned that the statement, while voluntary, was unfairly prejudicial to Kazanas.

The circuit court also took up the State's notice of intent to use Kazanas's prior bad acts, namely the 2007 assault and a 2006 abuse of family or household member arrests that led to convictions.  The circuit court precluded use of Kazanas's prior bad acts but stated that it would revisit its ruling if the defense opened the door to that evidence.

B.  **Trial Testimony**

1.  **The State's Case in Chief**

The State called former HPD Police Officer James Easley. He testified that he saw Kazanas dressed as a knight on Halloween in Waikiki.  He recognized Kazanas from his police officer days.  Years before (in 2005), Easley had responded to

the Aloha Surf Hotel after Kazanas had fallen from a ninth floor balcony.  When Easley arrived, Kazanas was still coherent.  Easley testified he would never forget Kazanas's name or face because the incident had an impact upon him.

Easley testified that he saw Kazanas, who was holding something in his hand, "str[ike] the back window of a white sedan that was stopped there in traffic, shattering the glass."  Kazanas then "ran around to the front of the car and he jumped on the hood of the car, kind of rolling on over, and then he approached the driver's side window of the vehicle and began punching the driver through the . . . open window."  After the incident ended, Easley contacted his police officer friends on duty and identified Kazanas as the suspect.

The State then called complaining witness Geoffrey Ross.  He testified that it was about midnight on Halloween when he was driving on Kuhio Avenue with friends, to see "the craziness, the festivities, what people were doing."  Ross testified that a group of about a dozen or two dozen people ran across the street in front of the car.  They were running to observe a fist fight.  "Out of the blue," Ross testified, "one more person [came] charging across the street . . . and ran headlong into the right front corner of the car. . . ."  Ross wondered if the person was injured, when the person "[a]ll of a sudden . . . bounce[d] up and continue[d] right through . . . to where the fight was."

Ross sensed that people who had just witnessed what happened thought he was "a person who had just hit a pedestrian" and "converged on the car to accuse [him]" and stop him from getting away.

As he slowly moved his car over to the curb, a crowd of people began yelling, pounding on the windows of the car, and rocking the car. Someone broke the back windshield, but Ross could not see who it was; Ross had a passenger in the back seat at the time. Someone with heavy shoes or boots was also on the hood of the car, stomping against the windshield in an attempt to crack it. That person "hopped off to the left side of the car" and came up to Ross's open window. He "encircle[d Ross's] neck and h[e]ld onto it, and then -- with the one arm, and then with the other . . . punch[ed] the side of [Ross's] face with a closed fist." Ross was struck "two, three times" to the "[l]eft side cheek and ear area, jaw."

After the attack, Ross drove slowly up Kuhio Avenue towards some police cars and reported the incident. Not long after the incident, Ross was taken to do a drive-by identification of the suspect. He was "[a]s certain as [he] could be" that he identified Kazanas as his assailant during the drive-by identification. On cross-examination, Ross testified that he "didn't believe that" the person who punched him was "the person who broke the glass because [he] couldn't see how a person could

11

break the glass and in that short of a time . . . then appear on the front of the car."

The State next called Officer Avilla, who had been with HPD for five years at the time of trial.  She testified that on Halloween night in 2011, she was on patrol when she was instructed to stand by Kazanas on Kuhio Avenue to await a field show-up identification.  After a positive identification was made, Kazanas was placed under arrest.  Officer Avilla's role was to transport Kazanas to Queen's Medical Center.  She noticed Kazanas had cuts, scrapes, and redness on his right hand.

At the hospital, Kazanas "was being rude and saying things that were verbally offensive to other people in the area," so Officer Avilla moved him to the HPD patient room away from other patients.  In order to "take his mind off of what he was saying," she engaged Kazanas in conversation.  Officer Avilla "ask[ed] him how was his Halloween, did he enjoy the costumes, things along that matter, but never about the investigation."  Kazanas then stated, "If people didn't upset me, I wouldn't have to punch them."  Officer Avilla testified that Kazanas made the statement even though she "was not asking him anything about the investigation."  She then immediately told Kazanas "that whatever he said can be used against him in a court of law, and to stop what he was saying."

### 2.  The Defense's Case in Chief

Kazanas's defense was, not only did he not commit the offenses, he was physically incapable of committing the offenses.  Kazanas called his friends Simon Farrington and Hans Kolbisen, who were both with him on Halloween.  Both testified that Kazanas was not the person who broke the car windshield and punched the driver.

Kazanas also testified in his own defense.  He stated that a group of friends met at his house before heading into Waikiki on Halloween night.  Kazanas was briefly separated from the group.  During the time he was separated, someone drop-kicked him to the ground.  He explained that red marks on his knuckles were the result of his labored attempts to "[s]tand[] up after [he] had been kicked. . . ."

During this part of his testimony, Kazanas elaborated on his physical condition.  According to Kazanas, his "wrist doesn't bend back . . . [due to] a double compound fracture from falling off the nine-story building," and his right arm cannot extend beyond 90 degrees.  Due to the limitations in his wrist and right arm, Kazanas was "unable to get to the upright position placing both of [his] hands on the ground, so [he had] to use [his] knuckles [to] push [himself] off up the ground. . . ."  His right leg also does not bend beyond 90 degrees.  He explained that the nine-story fall resulted in "four lumbar

vertebrae [shattering], double compound fractures on [his] wrists, double compound fractures on both of [his] thighs and both of [his] shins, and broke[n] . . . arms and elbows and shoulders. . . ."  Kazanas recalled that he was in a "medically-induced coma for three weeks [and] three weeks in recovery, in traction. . . ."

He resumed his testimony about Halloween night, stating that after he got up from being drop-kicked, he "shuffled away" because he "can't run."  Kazanas then returned to his group of friends and witnessed the incident involving Ross.  Kazanas testified that he was not the one who smashed the car's back window.  He also testified that he did not jump on the hood of the car, because he would only have been able to "crawl up onto the hood" because he "can't jump."  He elaborated, "My legs restrict me to jump.  I have about 37 screws and seven rods in my legs from my hips to my feet; it's like I'm wearing a pair of steel-toe boots all the time.  I can barely jump an inch or two off the ground."

Kazanas also denied reaching into the car to punch Ross; he testified, "I wouldn't have been able to reach into the car . . .  I have limited range of motion on my arm, my right arm specifically."  Kazanas explained that he has "calcium deposits in [his] elbow restricting any movement," as well as calcium deposits in his knee that render him barely able to "walk up a

set of steps without kicking the top rung."  Kazanas characterized himself as "disabled."  Kazanas stated that when the incident was over, he walked away.

When asked why he told Officer Avilla, "I wouldn't have to punch people if they didn't upset me," Kazanas explained that he was "under stress" and "was just speculating to the fact that [the police officers] said that I was under arrest for an assault."  On cross-examination, Kazanas affirmatively answered the State's question that he "couldn't have done this attack because [he] physically can't attack a person. . . ."

As a result of Kazanas's testimony that he was not physically capable of committing the charged offenses, the State sought to revisit the issue of Kazanas's prior bad acts.  The State argued that Kazanas "opened the door" to the admission of prior bad act evidence when he argued that he was physically incapable of breaking the car windshield and punching Ross because of injuries he suffered from the nine-story fall.  The defense counter-argued that the prior bad acts were dissimilar to the acts for which Kazanas was on trial:  first, Kazanas was the one injured in the 2007 assault; second, the 2006 abuse of family or household member involved Kazanas's striking someone with a walking stick, and there was no allegation in the instant case that Kazanas struck anyone with an implement.

15

The circuit court allowed the admission of the prior bad

act evidence as follows:

> [W]hat is abundantly clear in the record thus far is that Mr. Kazanas as a result of the injuries that he sustained in 2005 from the fall from the ninth floor lanai of I believe it's the Aloha Surf . . . that he sustained some very serious and significant injuries that rendered him essentially and in his words disabled and physically incapable of engaging in certain types of physical conduct or actions.
>
> And so given that, the State's request to question the defendant regarding these prior incidents is not the typical situation where it's going to some sort of 404(b) type of purpose such as to establish intent, knowledge, modus operandi, absence of mistake, any of those things. In this particular instance, the Court believes that the information that is contained within the State's notice, at least selected and very limited portions of it, would appear to be relevant to the jury's assessment of the defendant's, number one, his credibility, because he's made statements here in court that he doesn't have certain physical capabilities, yet as documented in these reports there are several references to him punching individuals, to him running away, to him jumping . . . and to the extent that the fact that there is contrary evidence that would bear upon the credibility of the defendant's testimony, clearly that would be relevant.
>
> Also, it would be relevant just squarely on the issue of whether he has these physical capabilities or not.  It's up to the jury to decide.  I'm not going to decide.  But this evidence in that limited capacity would appear to be appropriate.

The circuit court also noted that it was "absolutely crucial

. . . that a cautionary instruction would have to be given. . .

."  The circuit court further warned the State that the "only

thing that [it was] going to be permitted to ask the defendant

are things that related to his physical actions in those prior

incidents," as related in the respective police reports, but not

the facts of arrest or conviction.  The circuit court also noted

for the record that it performed a HRE Rule 403 balancing test

and "believe[d] the probative value of the proffered evidence as

16

limited by the Court outweigh[ed] any concern of any unfair or substantial prejudice to the defendant."

Before the State cross-examined Kazanas on his prior bad acts, the circuit court instructed the jury as follows:

> You may hear evidence relating to one or more prior incidents involving the defendant. This evidence is admitted for a specific limited purpose and only may be considered by you as bearing upon the credibility of the defendant and whether the defendant may or may not have certain physical capabilities.
> You are specifically instructed that you may not consider this evidence as establishing any violent or bad character of the defendant, or that it proves that he acted in conformity therewith during the events underlying the alleged offenses in this case.
> You are prohibited from considering this evidence on any other issue or for any other purpose besides what the Court has ordered.

The State then cross-examined Kazanas about these prior bad acts, which Kazanas acknowledged happened after his 2005 fall. Kazanas admitted that in 2007, he ran "as fast as [he could]" down the street after two men before jumping over a waist-high picket fence. Then he and another individual punched the two men in the face. Kazanas also admitted that in 2006, he struck a woman in the face with his cane and punched her on the face, arms, and legs.

On redirect examination, Kazanas testified that he used a cane to get around after his nine-story fall. With regard to the punching incidents, Kazanas testified that he punched with his left arm because his right arm was in a cast. He also

testified that in the 2007 incident, he and another individual were punching a person who had assaulted him earlier.

### 3.    Verdict

The jury acquitted Kazanas of Count 1 (Criminal Property Damage in the First Degree) and convicted Kazanas of Count 2 (UEMV).  The circuit court entered a Judgment of Acquittal as to Count 1, and a Judgment of Conviction of Probation Sentence as to Count 2.  Kazanas was sentenced to five years' probation, with a special condition of 90 days' imprisonment.  Kazanas timely appealed.

### C.  ICA Appeal

On appeal, Kazanas raised two points of error:

A.  The trial court erred in allowing Defendant's statement to Officer Avilla into evidence.

B.  The trial court erred in allowing prior incidents involving the Defendant into evidence.

In a published opinion, a majority of the ICA affirmed Kazanas's Judgment of Conviction of Probation Sentence, rejecting both of Kazanas's points of error, discussed in greater detail below.  State v. Kazanas, 134 Hawaiʻi 117, 129, 336 P.3d 217, 229 (2014).

### 1.    Admission of Statement to Officer

As to Kazanas's argument that his incriminating statement should have been suppressed at trial, the ICA held the following:

> We conclude that Officer Avilla did not subject Kazanas to "interrogation" for purposes of Miranda and that Kazanas's statement was not in response to "interrogation" by the Officer. Therefore, the absence of prior Miranda warnings by Officer Avilla did not provide a basis to suppress Kazanas's spontaneous and volunteered statement. Under the circumstances presented, we hold that the trial court properly permitted the State to introduce Kazanas's statement at trial.

134 Hawaiʻi at 119, 336 P.3d at 219. The ICA noted that there was "no dispute that Kazanas was in custody when he made the challenged statement to Officer Avilla," thus limiting its analysis to "whether Kazanas was subjected to 'interrogation' when he made the statement." 134 Hawaiʻi at 126, 336 P.3d at 226.

The ICA observed, "The United States Supreme Court defines 'interrogation' for Miranda purposes as referring to 'express questioning or its functional equivalent.'" Id. (citing Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). The ICA also quoted Innis for the proposition that "the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." Id. (citing 446 U.S. at 301-02) (footnote omitted; emphasis added by ICA). According to the ICA, this definition of "interrogation" was adopted by the Hawaiʻi Supreme Court in Ketchum, 97 Hawaiʻi at 119, 34 P.3d at 1018, as follows: "[T]he ultimate question becomes whether the police officer should have known that his or

19

her words or actions were reasonably likely to elicit an incriminating response from the person in custody." Id. (brackets omitted). The ICA noted that Ketchum held that whether "interrogation" has occurred depends upon the "totality of the circumstances . . . with a focus upon the officer's conduct, the nature of the question (including whether the question is a 'routine booking question'), and any other relevant circumstance." 97 Hawai'i at 121, 34 P.3d at 1020. Further, the ICA noted, "[V]olunteered confessions or admissions, obtained independent of express police questioning or its functional equivalent, are admissible." Kazanas, 134 Hawai'i at 126, 336 P.3d at 226 (citing, inter alia, State v. Ikaika, 67 Haw. 563, 566, 698 P.2d 281, 284 (1985)).

The ICA then examined Ikaika, a case in which this court held that the defendant was not subjected to interrogation. 67 Haw. 563, 698 P.2d 281. In that case, Lieutenant Richard Bartolome, who was acquainted with the defendant (Ikaika), asked him while he was booking and fingerprinting him, "What's happening? Must be heavy stuff for two detectives to bring you down here?" 67 Haw. at 565, 698 P.2d at 283. Ikaika "responded that he had been picked up for questioning about [a] murder," then, "[w]ithout further comment by Bartolome," Ikaika blurted out, "Bartolome I cannot lie to you, you've done a lot for me

and you have been too nice to me. I shot the haole." Id. This court held that Bartolome's question was just a "pleasantry," and that Ikaika's confession "was of the nature of an unsolicited, spontaneous statement made in the absence of any police questioning." 67 Haw. at 567, 698 P.2d at 285.

Analogizing Ikaika to the instant case, the ICA concluded, "under the totality of the circumstances, that Kazanas's statement, 'If people didn't upset me, I wouldn't have to punch them,' was volunteered, unsolicited, and spontaneous, and was not in response to any interrogation by Officer Avilla." Kazanas, 134 Hawaiʻi at 127, 336 P.3d at 227. Therefore, the ICA held that prior Miranda warnings were not required. Id. The totality of the circumstances included (1) Officer Avilla's warning that Kazanas was not allowed to talk about the case or say anything about what he had been arrested for; (2) the "small talk" nature of Officer Avilla's questions about Halloween, akin to the "pleasantry" in Ikaika; (3) the non-responsive and "out-of-the-blue" nature of Kazanas's statement about punching people; (4) the period of time that had passed between Officer Avilla's small talk questions and Kazanas's statement; and (5) Kazanas's own explanation that he made the statement because he was "under stress" and "just speculating to the fact that [the police] said that [he] was under arrest for an assault." 134

Hawai'i at 127-28, 336 P.3d at 227-28.  The ICA then held that the circuit court did not err in permitting the State to introduce Kazanas's volunteered statement at trial.  134 Hawai'i at 128, 336 P.3d at 228.

Judge Foley dissented.  134 Hawai'i at 129, 336 P.3d at 229 (Foley, J., dissenting).  To Judge Foley, "Kazanas' statement was obtained as a result of a custodial interrogation because Avilla was aware of the circumstances of Kazanas' detention, and Avilla asked an open-ended question, the subject matter of which was the same as that for which Kazanas was detained."  134 Hawai'i at 130, 336 P.3d at 230 (Foley, J., dissenting) (footnote omitted).  Unlike Lieutenant Bartolome in the Ikaika case, Officer Avilla "was familiar with [the detainee's] case, the two were not previously acquainted, and [the detainee's] statement . . . was responsive to the police officer's question."  Id. (Foley, J., dissenting).  Judge Foley considered Officer Avilla's explanation that she asked about Halloween to calm Kazanas down to be "nothing more than a post hoc rationalization for asking the question."  Id. (Foley, J., dissenting) (citing Ketchum, 97 Hawai'i at 119, 34 P.3d at 1018.

Judge Foley then analogized Kazanas's case to Ketchum, a case in which this court held that police officers who asked a detainee for his home address should have reasonably known that

22

asking the question would elicit an incriminating response, as the detainee lived at a residence, which was identified in a search warrant, in which drugs had just been found.  Id. (Foley, J., dissenting) (citing Ketchum, 97 Hawai'i at 128, 34 P.3d at 1027).  Judge Foley stated, "[S]ince Avilla knew the events of Halloween night led to Kazanas' arrest, asking how his night went invited Kazanas to describe events underlying his arrest."  134 Hawai'i at 131, 336 P.3d at 231 (Foley, J., dissenting).  Judge Foley believed the circuit court erred in admitting the statement, and that the error was not harmless beyond a reasonable doubt, as Kazanas's case rested upon the credibility of his witnesses versus those of the State.  Id. (Foley, J., dissenting).

### 2.  Admission of Prior Bad Acts

As to Kazanas's second point of error, the ICA held "that the trial court did not err in permitting the State to introduce prior incidents involving Kazanas that were relevant to his physical capabilities, after Kazanas opened the door to such evidence."  134 Hawai'i at 119, 336 P.3d at 219.  Kazanas opened the door by testifying that after his 2005 nine-story fall, "he was physically incapable of engaging in the conduct alleged by [Ross], namely, jumping on the hood of the car and reaching into the car and punching [Ross]."  134 Hawai'i at 129, 336 P.3d at

23

229. The ICA also concluded, "[W]e cannot say that the Circuit Court abused its discretion in balancing the probative value of the evidence regarding the prior incidents against the risk of unfair prejudice," further noting that the circuit court's limiting instruction "served to mitigate any unfair prejudice resulting from the evidence of the prior incidents." Id. (citation omitted). Judge Foley did not dissent to this holding.

## III.  Standards of Review

### A.  Violation of Miranda Rights

Whether an accused's right against self-incrimination under the Hawai'i constitution was protected through the use of a Miranda warning is a question of constitutional law, which this court reviews de novo under the right/wrong standard. State v. Jenkins, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations omitted). We "exercise our own independent constitutional judgment[,] based on the facts of the case[,]" to answer questions of constitutional law. Id.

### B.  HRE Rules 404(b) and 403

> "Prior bad act" evidence under [HRE] Rule 404(b) . . . is admissible when it is 1) relevant and 2) more probative than prejudicial. A trial court's determination that evidence is "relevant" within the meaning of HRE Rule 401 . . . is reviewed under the right/wrong standard of review. However, a trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 . . . is reviewed for an abuse of discretion. An abuse of discretion occurs when the court clearly exceeds the bounds of reason or

24

> disregards rules or principles of law to the substantial
> detriment of a party litigant.

State v. Behrendt, 124 Hawai'i 90, 102, 237 P.3d 1156, 1168 (2010) (brackets and ellipses in original) (citation omitted).

**IV.  Discussion**

**A.    Kazanas's Right against Self-Incrimination Was Violated.**

On certiorari, Kazanas argues, "There [were] no exigent circumstances nor legitimate purpose for Officer Avilla to engage in such conversation with Petitioner Kazanas while in her custody which involved 'Halloween' events which were related to the circumstances of his arrest."  Kazanas argues that Officer Avilla, who had five years' experience with HPD at the time of Kazanas's arrest, "should have known that such conversation was reasonably likely to elicit an incriminating response from Petitioner Kazanas."  The State, in its Response, counter-argues that Kazanas "seems to have omitted numerous crucial details that are part of the 'totality of the circumstances' surrounding his utterance."  The State endorses the ICA majority's detailing of the totality of the circumstances, as well as its conclusions that Officer Avilla's questions did not constitute interrogation and that Kazanas's statement was volunteered.

The Fifth Amendment to the United States Constitution states, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself. . . ."

Similarly, Article I, section 10 of the Hawaiʻi Constitution provides, in relevant part, that "[n]o person shall . . . be compelled in any criminal case to be a witness against oneself." This section of the Hawaiʻi Constitution "provides 'an independent source' from that of the fifth amendment to the United States Constitution for the 'protections which the United States Supreme Court enumerated' in Miranda. . . ." Ketchum, 97 Hawaiʻi at 116, 34 P.3d at 1015 (citing State v. Santiago, 53 Haw. 254, 266, 492 P.2d 657, 664 (1971)). "[A]s a matter of state constitutional law," id., "before the State may use statements stemming from custodial interrogation, it must first demonstrate the use of procedural safeguards effective to secure the privilege against self-incrimination." Ikaika, 67 Haw. at 566, 698 P.2d at 283-84 (citing, inter alia, Miranda, 384 U.S. at 467).

A critical safeguard is the Miranda warning: an accused must be "warned that he or she had a right to remain silent, that anything said could be used against him or her, that he or she had a right to the presence of an attorney, and that if he or she could not afford an attorney one would be appointed for him or her." Ketchum, 97 Hawaiʻi at 116, 34 P.3d at 1015 (brackets and citation omitted). The Santiago Court held that "every accused must be informed of the fact that he or she has

26

certain rights under the Hawaiʻi Constitution." Ketchum, 97 Hawaiʻi at 116, 34 P.3d at 1016 (citing Santiago, 53 Haw. at 267, 492 P.2d at 665) (brackets omitted). To be thus informed "maintains the value of protecting the accused's privilege to freely choose whether or not to incriminate himself or herself," because "to convict a person on the basis of a statement procured in violation of his or her constitutional rights is intolerable." Ketchum, 97 Hawaiʻi at 116-17, 34 P.3d at 1015-16 (citing Santiago, 53 Haw. at 267, 492 P.2d at 665) (brackets and ellipsis omitted).

We have held that the "Miranda rule" is a "constitutionally prescribed rule of evidence that requires the prosecution to lay a sufficient foundation" before adducing at trial evidence of statements made by a defendant subjected to custodial interrogation. 97 Hawaiʻi at 117, 34 P.3d at 1016 (footnote omitted). If a defendant was not Mirandized before providing such statements, then the statements may not be used either as direct evidence or to impeach the defendant's credibility. See State v. Hoey, 77 Hawaiʻi 17, 33, 881 P.2d 504, 520 (1994). A defendant seeking to suppress his or her statement at trial "must establish that his or her statement was the result of (1) 'interrogation' that occurred while he or she was (2) 'in

27

custody.'" Ketchum, 97 Hawai'i at 118, 34 P.3d at 1017 (citations omitted).

There is no dispute that Kazanas, who was under arrest by the time Officer Avilla engaged him in conversation about Halloween, was "in custody"; therefore, we examine whether Officer Avilla's Halloween questions constituted "interrogation."

As a preliminary matter, we clarify that determining whether "interrogation" has taken place is not measured by the "totality of the circumstances," as Ketchum held; rather, "interrogation" occurs when police know or should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect, as Innis held. The United States Supreme Court in Innis addressed the situation, similar to this case, in which a defendant was in custody, and the only question was whether the police officers "interrogated" him. In other words, the Court did not address the meaning of "custodial interrogation" as a single integrated determinant in applying Miranda; rather, the court addressed only the meaning of the "interrogation" prong under Miranda. See 446 U.S. at 298 ("It is . . . uncontested that the respondent was 'in custody' while being transported to the police station. The issue, therefore, is whether the respondent was 'interrogated' by the police officers in violation of the respondent's undisputed

28

right under <u>Miranda</u> to remain silent until he had consulted with a lawyer.") (footnote omitted).  The <u>Innis</u> Court defined "the term 'interrogation' under <u>Miranda</u>" as "not only . . . express questioning, but also . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  446 U.S. at 301 (footnotes omitted).  Notably, the United States Supreme Court did not reference a "totality of the circumstances" standard for measuring when interrogation has occurred.

This court first adopted the <u>Innis</u> definition of "interrogation" in <u>State v. Paahana</u>, 66 Haw. 499, 666 P.2d 592 (1983).  <u>Paahana</u> discussed the distinction between the <u>Innis</u> test for interrogation and the totality of the circumstances test as follows:

> To be considered custodial interrogation, an officer's questions or actions must be of such a nature that would "'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination."  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 299 (1980) (quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 457-58 (1966).  <u>In determining whether the defendant's statement was made in a custodial context, the totality of circumstances must be considered, including the time, place and length of the interrogation, the nature of the questions asked, the conduct of the police at the time of the interrogation, and any other pertinent factors.  See State v. Melemai</u>, 64 Haw. 479, 481, 643 P.2d 541, 544 (1982), <u>State v. Sugimoto</u>, 62 Haw. 259, 265, 614 P.2d 386, 391 (1980), <u>State v. Patterson</u>, 59 Haw. 357, 361, 581 P.2d 752, 755 (1978).  <u>In determining whether an officer's questions constitute interrogation, the test is whether the officer should have known that his words and actions were reasonably likely to elicit an incriminating response from defendant.</u>  <u>Innis</u>, 446 U.S. at 301.

29

Paahana, 66 Haw. at 502-03, 666 P.2d at 595-96 (emphasis added). This court, like the Innis Court, made no mention of a "totality of the circumstances" review of the officer's words and actions in evaluating whether "interrogation" had taken place. Instead Paahana cited Melemai, Sugimoto, and Patterson, for the proposition that the "totality of the circumstances" test applies in determining when on-the-scene and/or investigative questioning by the police develops into custodial interrogation, in the sense that the defendant is deprived of his or her freedom of action in any significant way. In other words, in Melemai, Sugimoto, and Patterson, there was no dispute that the defendants had been interrogated by the police; at issue in those cases was whether the defendants were "in custody" as a result of the defendant being subjugated to the will of the examining officer by the interrogation.

In Melemai, a jogger was struck by a pick-up truck. 64 Haw. at 480, 643 P.2d at 485. Eyewitnesses gave the police the truck's license plate number, and the police visited the residence of the truck's registered owner, the defendant. Id. Without Mirandizing him, the police asked the defendant if he had hit anyone with his car and why. Id. In analyzing whether the defendant was in custody when the police questioned him, the Melemai court stated:

> Since defendant was "interrogated" within the meaning of Miranda, the determinative issue is whether defendant was in custody or otherwise deprived of his freedom of action in any significant way.  This determination is to be made by objectively appraising the totality of the circumstances.  These include the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and all other relevant circumstances.

64 Haw. at 481, 643 P.2d at 544 (emphasis added and citations omitted).

Similarly, Sugimoto involved police questioning of an individual who voluntarily came to the police station to speak about a crime and who was not, at that time, a suspect and was not Mirandized.  62 Haw. at 265, 614 P.2d at 391.  The defendant later became a suspect and was charged and tried for the crime, and he argued that "because the questioning took place at the police station, Miranda warnings should have been given to him even though at the time of the interrogation he was not a suspect in the investigation."  Id.  In other words, "interrogation" standing alone was not at issue; rather, at issue was whether the defendant was "in custody when he was questioned."  This court stated

> To determine whether custodial interrogation occurred and Miranda warnings were required, we must objectively examine the totality of the circumstances at the time of the questioning.  Factors for our consideration include the time and place of the interrogation, the length of the interrogation, the questions asked, the behavior of the police officer, and any other pertinent circumstances. . .  We hold that the fact that the questioning occurred in the police station is but one factor, albeit an important once, in deciding whether the defendant-appellant was in custody when he was questioned.

Id. (emphasis added).

Lastly, Patterson involved investigative questioning by the police when they encountered the defendant at the scene of a burglary in progress.  59 Haw. at 358, 581 P.2d at 366.  The police asked the defendant if he lived at the property and whether he had permission to be there; if he owned the car he was standing next to; and whether personal property seen on the front seat of the car belonged to him.  Id.  After the defendant answered the questions in the negative, the police arrested him upon probable cause that he committed burglary.  Id.  The defendant successfully moved to suppress these statements, arguing that he was not Mirandized at the time.  59 Haw. at 366, 581 P.2d at 753.  This court reversed the suppression order, noting

> Where the police, prior to questioning the individual, are in possession of facts sufficient to effect an arrest without a warrant based upon probable cause, it is less likely that the person confronted would be allowed to come and go as he pleases.  The degree of this likelihood may, of course, depend upon the nature and gravity of the offense, as well as other circumstances.  In any event, whether the defendant was in custody or otherwise deprived of his freedom of action for Miranda purposes is to be determined from the totality of the circumstances, objectively appraised.  These would include the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and all other relevant circumstances.

59 Haw. at 361, 581 P.2d at 755 (emphasis added and citations omitted).  In short, all of these cases utilized a "totality of the circumstances" test in determining whether defendants, who were plainly subjected to police questioning, were "in custody."

In the instant case, the situation is precisely the reverse: there is no dispute that Kazanas was "in custody" because he was under arrest; at issue in this case is whether he was "interrogated."  Therefore, the "totality of the circumstances" test does not apply to this determination.

We recognize (as did the ICA) that this court stated in Ketchum, "[W]hether a police officer has subjected a person to 'interrogation' is determined by objectively assessing the 'totality of the circumstances.'"  97 Hawai'i at 119, 34 P.3d at 1018 (citing State v. Ah Loo, 94 Hawai'i 207, 210, 10 P.3d 728, 731 (2000); and Ikaika, 67 Haw. at 567, 698 P.2d at 284).  The cases cited for the "totality of the circumstances" standard for analyzing whether "interrogation" has taken place do not support the Ketchum court's statement.  Taking the older case, Ikaika, first, we note that that case held, "As it is undisputed that the Defendant in the instant case was in[]custody at the time his incriminating statements were made, our inquiry will focus on whether he was subject to interrogation.  The test is whether the police officer should have known that his words or actions were reasonably likely to elicit an incriminating response from the Defendant."  67 Haw. at 567, 698 P.2d at 284 (citing Innis, 446 U.S. at 301) (footnote omitted).  Ikaika footnoted the "totality of the circumstances" test, listing "time, place and

33

length of interrogation, the nature of the questions asked, the conduct of the police at the time of the interrogation, and any other pertinent factors," but only to note that the test is used for purposes of "determining whether Defendant's statements were made in a custodial context," i.e., not for purposes of determining whether a defendant was "interrogated." 67 Haw. at 567 n.2, 698 P.2d at 284 n.2 (emphasis added). Far from adopting a "totality of the circumstances" test for interrogation, Ikaika reaffirmed that "[t]he test" for "interrogation" is the Innis test. 67 Haw. at 567, 698 P.2d at 284 (citing Innis, 446 U.S. at 301) (footnote omitted).

The second case cited by Ketchum, Ah Loo, similarly does not support the proposition that the "totality of the circumstances" test is used in determining "interrogation." Ah Loo involved facts similar to Melemai and Sugimoto, in that a defendant was subjected to on-the-scene express questioning by police. In Ah Loo, the defendant was asked his age by a police officer who encountered him at a scene where underage drinking was suspected. 94 Hawaii at 209, 10 P.3d at 730. The police officer "subjected Ah Loo to 'express questioning;'" thus, there was no doubt Ah Loo was "interrogated." 94 Hawaiʻi at 210, 10 P.3d at 731. Like Melemai and Sugimoto, and unlike the instant case, therefore, "the outcome dispositive issue" in the Ah Loo case was "whether Ah Loo was 'in custody.'" Id. This court

held, "To determine whether 'interrogation' is 'custodial,' we look to the totality of the circumstances, focusing on 'the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and [any] other relevant circumstances." Id. (citing, inter alia, Melemai, 64 Haw. at 481, 643 P.2d at 544; Sugimoto, 62 Haw. at 265, 614 P.2d at 391; and Patterson, 59 Haw. at 361, 581 P.2d at 755). In short, the statement in Ketchum that "interrogation" is determined by looking at the "totality of the circumstances" finds no basis in Ikaika or Ah Loo or this court's prior case law.[4]

Further underscoring the fact that Ketchum misstated the test for interrogation, we note that we have used the "totality of the circumstances" test only once since Ketchum's publication, see State v. Naititi, 104 Hawaiʻi 224, 236, 87 P.3d 893, 905 (2004), and mentioned it only once in passing in State v. McKnight, 131 Hawaiʻi 379, 392, 319 P.3d 298, 311 (2013). Furthermore, we have continued to refer solely to the Innis test in analyzing interrogation under Miranda without conducting or even referring to a "totality of the circumstances" review. See Joseph, 109 Hawaiʻi at 495, 128 P.3d at 808; Eli, 126 Hawaiʻi at

---

[4]    The Dissent acknowledges that it relies on only what it sees as an "implicit" application of a "totality of the circumstances" interrogation test in Innis and Ikaika in supporting Ketchum's statement. Dissent at 5.

522, 273 P.3d at 1208.  This suggests that <u>Ketchum</u>'s formulation does not constitute "the clear state of Hawai'i law" on interrogation under <u>Miranda</u>, contrary to the Dissent's assertion.[5]  Dissent at 3.

There is no need to overrule <u>Ketchum</u>, however, because the case properly "reaffirm[ed <u>Innis</u>'] principle that 'interrogation' consists of any express question – or, absent an express question, any words of conduct – that the officer knows or reasonably should know is likely to elicit an incriminating response."  97 Hawai'i at 121, 34 P.3d at 1020.  <u>Ketchum</u> also delineated the <u>Innis</u> principle as "the ultimate question" in evaluating whether the police have interrogated a defendant in custody.  97 Hawai'i at 120, 34 P.3d at 1019.  We agree and reaffirm that the touchstone in analyzing whether "interrogation" has taken place is whether the police officer "should have known that his [or her] words and actions were reasonably likely to elicit an incriminating response from the defendant."  <u>Paahana</u>, 66 Haw. at 503, 666 P.2d at 595-96 (citing <u>Innis</u>, 446 U.S. at 301).

---

[5]     Further, the Dissent maintains that we "denounce" the totality of the circumstances test in evaluating whether interrogation has occurred.  Dissent at 1, 8.  We do not "denounce" the test; we simply clarify that the appropriate test to use under a careful reading of our precedent is "whether the officer should have known that his words and actions were reasonably likely to elicit an incriminating response from defendant."  <u>Paahana</u>, 66 Haw. at 503, 666 P.2d at 595-96 (quoting <u>Innis</u>, 446 U.S. at 301)

In this case, in analyzing whether Kazanas was "interrogated," the majority of the ICA relied heavily upon Ikaika, a case in which this court held that a defendant's confession that he "shot the haole" to his police lieutenant acquaintance was "of the nature of an unsolicited, spontaneous statement made in the absence of police questioning."  67 Haw. at 565, 698 P.2d at 283.  Indeed, the court held the police lieutenant's words ("What's happening?  Must be heavy stuff for two detectives to bring you down here?") were merely a "pleasantry." 67 Haw. at 567, 698 P.2d at 285.  Ikaika is inapposite because under the facts of that case, Ikaika had not been "interrogated."  As Judge Foley noted in dissent in this case, unlike Bartolome and Ikaika, Avilla and Kazanas were not previously acquainted with each other.  134 Hawai'i at 130, 336 P.3d at 230 (Foley, J., dissenting).  Also unlike Bartolome, Avilla knew the circumstances behind her detainee's police involvement.  Id.  (Foley, J., dissenting).  Therefore, when Avilla asked Kazanas how his night was going, her words cannot be understood as a mere pleasantry like Bartolome's; it was reasonably likely that her question would have elicited Kazanas's incriminating statement.  This court in Ikaika noted that Bartolome, on the other hand, "[a]t most . . . could have expected that the Defendant respond to his pleasantry by informing him of the reasons for the Defendant's being booked

37

and the case he was involved in." Ikaika, 67 Haw. at 567, 698 P.2d at 284-85. Instead, Ikaika's full-blown confession was, in those circumstances, voluntary. We agree with the dissent that Ikaika does not govern this case.

Rather, Kazanas's situation is more analogous to Joseph, 109 Hawai'i 482, 128 P.3d 795, and State v. Eli, 126 Hawai'i 510, 273 P.3d 1196 (2012), which both involved police speaking with non-Mirandized suspects. In Joseph, the police engaged the defendant in a "pre-interview," in which they asked him questions about his involvement in a shooting without first reading him his Miranda rights; after the pre-interview, the police Mirandized the defendant then audiotaped a formal interview with him. 109 Hawai'i at 484, 487, 128 P.3d at 797, 800. The defendant was then charged with murder and firearm offenses, and he successfully moved to suppress his pre-interview and formal interview statements to the police. 109 Hawai'i at 487-88, 492, 128 P.3d at 800-01, 805. This court affirmed the circuit court, holding that "it [was] evident Miranda warnings, as independently grounded in the Hawai'i Constitution, were required prior to the pre-interview." 109 Hawai'i at 495, 128 P.3d at 808.

Similarly, in Eli, after a defendant had turned himself in for assaulting his daughter, he was arrested but not Mirandized,

then invited to give "his side of the story" to an HPD detective in a pre-interview.  126 Hawai'i at 514, 273 P.3d at 1200.  This court held that "after arrest the police practice of inviting an arrestee to make a statement and to give his or her 'side of the story' or similar entreaties in a 'pre-interview' before Miranda warnings are given, violates the defendant's right against self-incrimination, article I, section 10, and right to due process, article I, section 5, of the Hawai'i Constitution."  126 Hawai'i at 513, 273 P.3d at 1199 (footnotes omitted).

Eli and Joseph both involved express police questions about the circumstances giving rise to offenses later charged.  Kazanas's case differs only in degree.[6]  In determining whether Kazanas was "interrogated," we look to the test articulated in Paahana (and Eli and Joseph), which was "whether the officer should have known that his words and actions were reasonably likely to elicit an incriminating response from defendant."

---

[6]    The Dissent argues that Joseph and Eli are distinguishable from this case, inter alia, because the pre-interviews in those cases "occurred at the police station in an interview setting," and "Officer Avilla asked Kazanas general questions about his Halloween while they were waiting at the hospital."  Dissent at 16.  It is unclear why the location of the questioning should make a difference in determining, under Innis and Paahana, "whether the officer should have known that his words and actions were reasonably likely to elicit an incriminating response from defendant."  Paahana, 66 Haw. at 503, 666 P.2d at 595-96 (quoting Innis, 446 U.S. at 301).  The Dissent's distinction wrongly suggests that a court should more readily find that "interrogation" has taken place if questioning occurs at the police station.  That suggestion finds no support in Innis or Hawai'i case law.  Further, such a rule could encourage police officers to question suspects outside the confines of the police station in order to take advantage of a relaxed standard for reviewing whether interrogation has occurred based simply upon where questioning has taken place.

Paahana, 66 Haw. at 503, 666 P.2d at 595-96 (quoting Innis, 446 U.S. at 301); Eli, 126 Hawai'i at 522, 273 P.3d at 1208; Joseph, 109 Hawai'i at 495, 128 P.3d at 808.  Under this test, we look to the words and actions of the police officer, not to the totality of the circumstances.

The Dissent argues that the Innis analysis cannot be performed without a totality of the circumstances review.  Dissent at 8.  There is a difference, however, between considering the words and actions of the police officer and the "totality of the circumstances."  We view a "totality of the circumstances" review as sweeping in any circumstance, without limitation, for the court's consideration.  See, e.g., Ketchum, 97 Hawai'i at 119, 34 P.3d at 1018 (listing the following considerations under a "totality of the circumstances" review: "the conduct of the police, the nature of the questions asked, and any other relevant circumstance. . . ." (emphasis added).  The Innis test itself, however, set limits on what courts should consider in determining whether a police officer "should have known [his or her words or actions] were reasonably likely to elicit an incriminating response."  446 U.S.at 302.  Those limits were as follows:

> [T]he term "interrogation" under Miranda refers not only to express questioning but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses

> primarily upon the perceptions of the suspect rather than
> the intent of the police.  This focus reflects the fact
> that the Miranda safeguards were designed to vest a suspect
> in custody with an added measure of protection against
> coercive police practices, without regard to objective
> proof of the underlying intent of the police.

446 U.S. at 301 (emphasis added).  Thus, a police officer's words and actions evaluated under Innis would generally not include evidence of police intent.  Conducting a "totality of the circumstances" review to include evidence of Officer Avilla's intent, like the Dissent has (Dissent at 13), goes against Innis's express holding.

It is true that the Innis court footnoted that police intent may be relevant where, for example, "a police practice is designed to elicit an incriminating response from the accused," as it would be "unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect."  446 U.S. at 301 n.7.  In other words, evidence that the police know that they have designed a practice reasonably meant to elicit incriminating responses should be relevant in analyzing whether interrogation has taken place. That is not the case here, where evidence of Officer Avilla's subjective intent (that she was trying to calm Kazanas down) was used by the Dissent to excuse the reasonable consequence of her conduct, which was that her conversation about Halloween elicited an incriminating response from Kazanas.  Dissent at 12. Innis's exception for considering police intent does not stretch

41

that far.  See also Joseph, 109 Hawaiʻi at 495, 128 P.3d at 808

(holding that "[i]nterrogation involves any practice reasonably

likely to invoke an incriminating response without regard to

objective evidence of the intent of the police," and citing

State v. Jenkins, 1 Haw. App. 430, 437-38, 620 P.2d 263, 269

(1980), for the following statement:  "That the matron may not

have subjectively intended the question to yield a confession or

an incriminating statement is irrelevant.") (emphasis added).

In short, police intent is one of those circumstances that

would not be considered in reviewing a police officer's words

and actions.  In this case, the Dissent's conclusion that

Kazanas was not interrogated relies heavily upon Officer

Avilla's testimony about her subjective intent: "that the

questions she asked Kazanas were made in an attempt to calm

Kazanas down, and were nothing more than small talk that did not

have to do with the investigation." Dissent at 12.  The

Dissent's analysis of the interrogation issue illustrates how

using the improper legal test yields an incorrect result.  The

proper test is "whether the officer should have known that his

words and actions were reasonably likely to elicit an

incriminating response from defendant."  Paahana, 66 Haw. at

503, 666 P.2d at 595-96 (quoting Innis, 446 U.S. at 301).

In this case, Officer Avilla took Kazanas alone to HPD's

private room in the hospital.  Although she did not expressly

ask Kazanas about punching Ross and smashing the car's rear windshield, she did ask him how his Halloween went.  As the ICA dissent points out, Officer Avilla knew how Kazanas's Halloween went, as she encountered him at the tail end of his night at the field show-up identification, and she was directed to transport him to Queen's Medical Center after his UEMV arrest, which had occurred about an hour earlier.  As such, from Officer Avilla's stance, it was "reasonably likely" that Kazanas would answer the question about how his Halloween went with an incriminating statement about the events leading to Kazanas's arrest.  Therefore, Officer Avilla "should have known that [her] words or actions were reasonably likely to elicit an incriminating response' from the person in custody."  Ketchum, 97 Hawaiʻi at 119, 34 P.3d at 1018 (citation omitted).  In other words, Officer Avilla subjected Kazanas to "interrogation," without the protection of a Miranda advisement, thus rendering inadmissible his statement.  See Naititi, 104 Hawaiʻi at 237, 87 P.3d at 906 ("[I]f a defendant's Miranda rights against self-incrimination have been violated, then any resulting statement will be inadmissible at trial as a per se matter. . . .")

To conclude that Officer Avilla's question did not constitute "interrogation" (as the ICA majority and the Dissent have done) would undermine Kazanas's right against self-

incrimination under Article I, Section 10 of the Hawai'i Constitution and encourage police officers to engage suspects in custody in non-Mirandized and seemingly harmless conversations about "how their night was going" in the hope that the suspects may make incriminating statements about the events leading up to their arrest.  As the United States Supreme Court has observed, the Miranda warning "may serve to make the individual more acutely aware that he is faced with a phase of the adversary system -- that he is not in the presence of persons acting solely in his interest."  Miranda, 384 U.S. at 469.  In this case, Officer Avilla was attending an arrestee at Queen's Medical Center; although she testified that she intended her "small talk" to calm Kazanas down, her role as a police officer rendered her part of a system that was adversarial to Kazanas at that moment, and engaging in conversation at that point could not be "solely in his interest."  Kazanas had a right to know that then, via a proper Miranda advisement.

As Kazanas's statement was procured without a proper Miranda advisement, the circuit court erred in admitting the statement at trial.  See Hoey, 77 Hawai'i at 33, 881 P.2d at 520. We cannot say that this error is harmless beyond a reasonable doubt.  This case turned on the credibility of the State's versus Kazanas's witnesses.  See State v. Fetelee, 117 Hawai'i

53, 86, 175 P.3d 709, 742 (2008) ("In light of the [improper admission of evidence] and the fact that this case turns on the credibility of [the trial witnesses], we cannot say that the trial court's admission of the evidence was harmless beyond a reasonable doubt.")  There was a reasonable possibility that the admission of the statement contributed to his conviction.

Lastly, we address the ICA majority's incomplete statement about confessions:

> The use of a criminal defendant's voluntary statements and admissions as evidence at trial is a critical component of our criminal justice system. Voluntary statements and admissions are reliable.  They provide key evidence necessary to solve crimes and facilitate our search for the truth.  They provide assurance to the public that the culprit has been brought to justice and promote faith and confidence in our judicial system.

Kazanas, 134 Hawai'i at 118, 336 P.3d at 218.  A defendant's statements are only admissible when a defendant, subjected to custodial interrogation, is first advised of his or her Miranda rights, and, if so advised, nevertheless voluntarily, intelligently, and knowingly waives his or her constitutional rights.  A defendant in custody and subjected to interrogation has a right to be advised of the consequences of foregoing his or her right against self-incrimination so "that there can be any assurance of real understanding and intelligent exercise of the privilege."  Miranda, 384 U.S. at 469.  Then, should a Mirandized defendant decide to waive his or her right against

self-incrimination, the State must show that the waiver was made "voluntarily, knowingly, and intelligently." State v. Amorin, 61 Haw. 356, 358, 604 P.2d 45, 47 (1979).   A court reviewing such a waiver must "examine the entire record and make an independent determination of the ultimate issue of voluntariness based on the totality of circumstances."   McKnight, 131 Hawaiʻi at 393, 319 P.3d at 312 (citations omitted).   Thus, the use of a defendant's statements at trial often requires a rigorous review beyond a simple determination of "voluntariness." [7]   Therefore, the ICA majority's statement is incomplete.[8]

---

[7]      In Eli, we explained the difference between the Miranda inquiry and the voluntariness inquiry as follows:

> It must be emphasized that the Miranda requirement, based on article 1, section 10 of the Hawaiʻi Constitution, requires warnings to be given prior to questioning in a custodial setting, while constitutional due process, based on article 1, section 5 of the Hawaiʻi Constitution, requires a statement to be "voluntary" in order to be admissible.  "Put differently, if a defendant's Miranda rights against self-incrimination have been violated, then any resulting statement will be inadmissible at trial as a per se matter, obviating the need for any [voluntary] due process inquiry into whether the defendant's confession has been coerced[.]"  "Correlatively, having been properly Mirandized, if a defendant who is subjected to custodial interrogation makes a statement, then, depending on the circumstances, an inquiry into whether the defendant's right to due process of law has been violated via coercion, may be warranted."

Eli, 126 Hawaiʻi at 520 n.17, 273 P.3d at 1206 n.17 (citations omitted).

[8]      The Dissent defends the ICA majority's view that Kazanas's statement was voluntary, asserting

> This case does not involve long periods of isolation or interrogation, an atmosphere of intimidation, or purposeful subjugation of the defendant to the will of the police officer.  Furthermore, this case does not involve the "dangers of false confessions" that accompany an intimidating interrogation atmosphere.  If anything, the majority's holding in this case undermines the truth

(continued. . .)

**B.    The Circuit Court Abused Its Discretion in Applying Rule 403.**

Kazanas argues on certiorari that "allowing references to the prior aggressive conduct [i.e., punching and striking other persons on separate occasions] was definitely prejudicial and outweighed the probative value relating to Petitioner Kazanas's phsycial [sic] capabilities."  In other words, Kazanas challenges the circuit court's weighing of probative value versus prejudicial effect of the evidence under HRE Rule 403.

"[W]hen evidence of other crimes, wrongs, and acts [under HRE Rule 404(b)] is offered by the prosecution, the problem for

---

(continued. . .)
          seeking function of the judicial system by suppressing
          statements that were made without the influence of an
          interrogation atmosphere.  See State v. Flores, 131 Hawaiʻi
          43, 56, 314 P.3d 120, 133 (2013) ("Our courts are . . .
          forums for the discovery of truth."); see also Miranda, 384
          U.S. at 478 ("Any statement given freely and voluntarily
          without any compelling influences is, of course, admissible
          in evidence.")
Dissent at 18-19.  First, the constitutional test does not require
proof of an intimidating interrogation atmosphere.  The relevant
inquiry is whether Kazanas was subjected to interrogation.
     Second, the Flores case cited by the Dissent does not stand for
the proposition that suppressing statements hinders the truth-seeking
function of trial.  Rather, Flores held that a jury should be
instructed of the option of convicting a defendant of a lesser included
offense in order to ascertain the truth and render an accurate verdict.
131 Hawaiʻi at 56, 314 P.3d at 133.
     Lastly, we respectfully believe the Dissent takes the Miranda
proposition about voluntary statements out of context.  The Miranda
quotation goes on to state, "There is no requirement that police stop a
person who enters a police station and states that he wishes to confess
a crime, or a person who calls the police to offer a confession or any
other statement he desires to make."  384 U.S. at 478.  The United
States Supreme Court sought to reassure law enforcement that its
decision would not render all voluntary confessions inadmissible in
evidence.  Kazanas's case does not involve a voluntary unburdening of
the offenses committed on Halloween.  Rather, his statements were made
in response to Officer Avilla's interrogation.

the trial court is one 'of classifying and then balancing[, if necessary]. . . the prejudicial impact of the evidence [with] its probative worth.'"  State v. Castro, 69 Haw. 633, 644, 756 P.2d 1033, 1041 (1988) (first set of brackets in original; second set of brackets added).  The factors the trial court balances are:

> the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

Id. (citation omitted).

In its Response, the State argues that the balance of Castro factors tipped in favor of admitting the prior bad act evidence:

> The strength of the evidence regarding the prior incidents was relatively substantial inasmuch as [Kazanas] admitted to running jumping, and punching other people. The similarities between [Kazanas's] conduct at issue in the prior incidents and the conduct in which he engaged while committing the unauthorized entry into the CW's car were readily apparent.  The period of time between the prior incidents and the crime the jury convicted [Kazanas] of committing in the instant case also mitigated in favor of allowing the deputy prosecutor to question him about the prior incidents.  The instant crime occurred after [Kazanas's] fall in 2005 while he was allegedly still suffering from the debilitating effects of the fall.  The record also reveals that the deputy prosecutor demonstrated a legitimate and compelling need for the evidence regarding the prior incidents, inasmuch as the evidence would refute [Kazanas's] claim that he "couldn't have done this attack because [he] physically [could not] attack a person[.]"
> Moreover, the record does not reveal and [Kazanas] does not contend that the deputy prosecutor had more effective alternate proof to refute his claim regarding the allegedly lasting and debilitating effects of his fall. Significantly, there is no reason to conclude the evidence regarding the prior incidents "probably rouse[d] the jury to overmastering hostility," inasmuch as the deputy

48

> prosecutor generally limited the questions to that which
> was reasonably necessary to establish [Kazanas's] physical
> abilities.

Further, the State argues that the jury was given a limiting instruction on the use of the prior bad act evidence (immediately before the prosecutor's questioning of Kazanas about the prior bad acts, as well as at the end of trial), which the jury was presumed to have followed, and which dispelled any potential for unfair prejudice to Kazanas due to the admission of the evidence.  The State argues, "[T]he ICA concluded correctly that 'we cannot say that the Circuit Court abused its discretion in balancing the probative value of the evidence regarding the prior incidents against the risk of unfair prejudice, in allowing the State to introduce evidence of the prior incidents."

In this case, it is clear that evidence of the 2007 assault was properly admitted under Rule 403 for all the reasons expounded by the State above.  The 2007 assault incident involved witness statements that Kazanas and another individual ran up to two men, punched them in the face, then ran from police, physical acts Kazanas testified he was incapable of performing after the 2005 accident.  Kazanas even jumped a fence in the 2007 incident an attempt to elude the police.

Upon the admission of the evidence of the 2007 assault, however, evidence of the 2006 abuse of family or household

member incident was an abuse of discretion. Preliminarily, it should be noted that the 2006 abuse incident involved two sets of prior bad acts occurring contemporaneously: first, the complaining witness stated that Kazanas punched her on the face, arms, and legs; second, the complaining witness and another witness stated that Kazanas struck the complaining witness on the face with his cane. It is true that the evidence of the 2006 abuse bad acts was strong (based on similar evidence as the 2007 assault incident, namely police reports and witness statements). Kazanas's act of striking the complaining witness in the face with a cane, however, was not similar to the physical acts of punching, running, and jumping that he was accused of in the instant case, and that he denied the physical ability to perform after the 2005 accident. Therefore, the evidence was not needed. Alternative evidence of the 2007 assault incident, which the State was allowed to present, was more efficacious on the issue of Kazanas's physical ability to punch, run, and jump. Moreover, the fact that Kazanas struck a woman in the face with his cane carried with it the potential to rouse the jury to overmastering hostility against Kazanas. The circuit court, in short, abused its discretion in weighing the probative value versus potential prejudicial effect of the 2006 cane strike bad act evidence.

As to the punches to the complaining witness's face, arms, and legs in the 2006 abuse incident, while that evidence might have been similar to the punch in the instant case, it was also not needed, as the State already had been allowed to present efficacious, alternative proof of the same physical capabilities (i.e., evidence of the 2007 assault).  And again, evidence that Kazanas punched a woman in the face, arms, and legs could have potentially roused the jury to overmastering hostility against Kazanas.  Therefore, the circuit court abused its discretion in weighing the probative value versus potential prejudicial effect of the 2006 punching bad act evidence.

Consequently, the ICA erred when it held that it could not conclude that the circuit court abused its discretion in performing the HRE Rule 403 balancing test.  We cannot say that this error is harmless beyond a reasonable doubt.  This case turned on the credibility of the State's versus Kazanas's witnesses.  See Fetelee, 117 Hawai'i at 86, 175 P.3d at 742.  There was a reasonable possibility that the admission of the 2006 bad act evidence contributed to his conviction.

**V. Conclusion**

Kazanas was subjected to interrogation when Officer Avilla asked him about his Halloween.  Article I, Section 10 of the Hawai'i Constitution therefore required Officer Avilla to have

advised Kazanas of his <u>Miranda</u> rights prior to engaging him in the conversation.  Further, as his right against self-incrimination was not safeguarded during the conversation with Officer Avilla, Kazanas's statement should have been suppressed.  Therefore, the ICA majority erred in holding that Kazanas's statement was voluntary and therefore admissible at trial.  With respect to the 2006 incident, the ICA also erred in concluding that it could not be said that the circuit court abused its discretion in performing its HRE Rule 403 balancing in admitting evidence of Kazanas' prior bad acts.  The ICA's Judgment on Appeal and the circuit court's Judgment of Conviction of Probation Sentence are vacated, and this case is remanded for further proceedings consistent with this opinion.

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

