**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-19-0000350**
**17-MAY-2024**
**08:05 AM**
**Dkt. 117 MO**

NO. CAAP-19-0000350

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
PATRICK DONOHUE RUDERSDORF, also known as PATRICK
DONOHUERUDERSDORF SWANK, Defendant-Appellant


APPEAL FROM THE DISTRICT COURT OF THE SECOND CIRCUIT
LAHAINA DIVISION
(CASE NO. 2DCW-18-0000900)


**MEMORANDUM OPINION**
(By: Leonard, Acting Chief Judge, Hiraoka and Wadsworth, JJ.)

On April 13, 2018, Patrick D. **Rudersdorf** was charged by complaint with two counts of Assault in the Third Degree in violation of Hawaiʻi Revised Statutes (**HRS**) § 707-712(1)(a) for assaulting two girls, **K.W.** and **J.F.**, and one count of Harassment in violation of HRS § 711-1106(1)(a), of a third female named **Kuʻulei**. He pleaded not guilty. He was found guilty as charged after a jury-waived trial. He appeals from the "**Judgment** and Notice of Entry of Judgment" entered by the District Court of the Second Circuit, Lahaina Division, on March 29, 2019.[1] We vacate and remand for a new trial.

**(1)** Rudersdorf argues the complaint was defective because it was signed by a deputy prosecuting attorney instead of

_____

[1]    The Honorable Kirstin M. Hamman presided.

a complainant, and was not supported by a declaration or affidavit, as required by HRS § 805-1. State v. Thompson, 150 Hawaiʻi 262, 269, 500 P.3d 447, 454 (2021). HRS § 805-1 did not apply because the complaint did not request a penal summons or an arrest warrant — Rudersdorf was arrested at the scene. State v. Mortensen-Young, 152 Hawaiʻi 385, 387, 526 P.3d 362, 364 (2023). The complaint was not defective.

(2) Rudersdorf argues the trial court erred by admitting into evidence footage from Maui Police Department (**MPD**) officer Royce **Takayama**'s body-worn camera. The evidence was offered by the State to rebut Rudersdorf's trial testimony. Rudersdorf argued the footage contained statements by him that were inadmissible because they were made while he was in custody and interrogated without being given a Miranda warning. We review de novo under the right/wrong standard. State v. Kazanas, 138 Hawaiʻi 23, 33, 375 P.3d 1261, 1271 (2016).

Trial began on July 16, 2018. K.W., J.F., and Kuʻulei testified they were at Kāʻanapali beach on March 26, 2018. K.W. found a bodyboard in the bushes. No one was around and nothing else was by it, so K.W. grabbed it and took it into the water for 15-20 minutes. She was sitting on the board on the beach with J.F. and Kuʻulei. Rudersdorf came up, yelling "that's my board." He pushed K.W. off the board. While K.W. was on the ground, Rudersdorf picked up the board and hit her in the face with it. He walked away. He came back asking where his leash was. He spit on Kuʻulei and called her a "fat bitch." He tried to grab J.F.'s phone out of her hand. J.F. put the phone behind her. Rudersdorf slapped J.F. in the face three times.

Officer Takayama testified he responded to a call about a male harassing three females. While responding he was told that the male was hitting the females. The male was described as wearing an orange shirt and blue hat. He saw a male matching that description walking toward him with hotel security. He identified Rudersdorf as the male. As Officer Takayama was giving Rudersdorf the Miranda warning, Rudersdorf said he wanted

2

to remain silent.  Officer Takayama didn't complete the <u>Miranda</u> warnings because Rudersdorf interrupted, asking several times if he could leave.  Officer Takayama "told him he wasn't free to leave because we're still investigating the case."  Rudersdorf asked if the girls wanted to prosecute.  Officer Takayama "told him that Officer Cleghorn was speaking to them right now." Rudersdorf "turned and took off running."  Officer Takayama chased Rudersdorf for about 250 yards, handcuffed him, and placed him in the patrol car.

MPD officer William **Cleghorn** testified he was called to the Kāʻanapali Beach Hotel with Officer Takayama.  He interviewed three girls.  He walked to where Officer Takayama was standing with Rudersdorf.  He took Rudersdorf's information.  He went back to the girls.  As he was talking to them he heard over his radio that Rudersdorf ran away from Officer Takayama, so he gave chase.

Rudersdorf testified that he was vacationing on Maui with his family.  They rented two cabanas from the hotel.  His wife rented a boogie board.  They were going to get lunch.  He noticed three local girls inside the roped-off area who had been smoking what he thought was marijuana.  There was no one else in the cabanas.  He put the board under everything in the cabana, folded the top down, and left.  They were gone for about an hour. The girls were gone when he returned.  The board was also gone. He walked around to find it.  He saw the girls under a tree with the board next to them.  He asked for the board back.  K.W. said, "fuck you haole, this is our board now.  If you want it, come and get it."  He retrieved the board after a "brief struggle."  He denied shoving K.W. off the board and hitting her with it.  He walked about 10 yards away, then noticed the leash was missing. He went back to ask if the girls had it.  The girls became very aggressive and threatened him.  He went to security, pointed out the girls, and said they'd stolen his property.  K.W. tackled him.  He was punched and kicked.  He was in the water.  The "waves were crashing in on -- or the waves were coming up."  The girls were scratching his back, kicking him.  He started

backpedaling and thought he was tackled a second time. The girls told him they were "going to come get you and your family." K.W. said she had a machete in her backpack and was going to "get" his kids. He went back to his family and said, "let's get outta here."

Rudersdorf testified that when he was with Officer Takayama, he looked down the boardwalk and saw his family go right next to the three girls. He said he was scared because the girls had threatened his family and he didn't want his family to get hurt. Officer Takayama didn't respond. Rudersdorf asked Officer Takayama if he was under arrest, and was told he was not. Rudersdorf testified that he "took off sprinting" to his wife and kids because he "was scared for 'em." He saw the girls on their phones while they were being interviewed by the police, and was afraid they were calling their friends or gang members "to come get us."

Rudersdorf testified on cross-examination:

> I remember . . . Officer Cleghorn coming up and, ah, Officer Takayama saying something about him not wanting to make a statement and me saying that's not true.
>
> And I tried to tell him what had happened and they would not listen to it. They said you -- you can't make a statement.
>
> Q.     Okay. And if I have both of their body cams and the videos of everything that transpired from their first intersection [sic] to when you ran, you're saying that those statements are going to be on these videos?
>
> A.     Yeah, I believe so.
>
> Q.     Okay. Um, also you said that you reported to them that these girls had threatened your family?
>
> A.     Yes.
>
> Q.     And you did that while you were on the beach?
>
> A.     Yes.
>
> Q.     Okay.
>
> A.     Very clearly too.

The defense rested. The deputy prosecuting attorney (**DPA**) stated:

> Your Honor, the State does have two rebuttal witnesses. I'm going to need to call the officers, lay the foundation, and get both of these videos in to show that, um, the defendant lied while he was on the stand.

Rudersdorf did not initially make a <u>Miranda</u> objection; he argued the videos could and should have been presented during the State's case-in-chief.

The DPA argued:

> Your Honor, since we don't have a jury here, I'm asking you only to view the interactions of the defendant with both of the police officers so that you can see what he did and did not say to the police officers.
>
> And I am offering that what you will see directly contradicts his testimony on the stand today about, um, telling the police officers on the beach that they -- that the girls had threatened his family and saying that he wanted to make a statement.
>
> [DEFENSE COUNSEL]: Then it should be limited to that and not Officer Takayama's interview of a witness. Okay. That had nothing to do with his encounter with advising him of his Miranda warnings. And that's the problem.
>
> THE COURT: So what does Takayama's body cam have to do with, um, the defendant's statement and contradicting those statements?
>
> [DPA]: Because Officer Takayama, um, from the moment that he interacted with the defendant on the beach, everything is on the body cam.
>
> Not once did the defendant tell him that, um, the girls had threatened his family. Not once did he say that he wanted to make a statement. And that you seeing that body cam, the entire interaction between the officer and the defendant, will show you that he was lying on the stand. That he never said those things.
>
> [DEFENSE COUNSEL]: Well, wait, does your body camera only include the interaction with Officer Takayama and my client. Or does it view -- include other aspects of Takayama's investigation?
>
> [DPA]: Your Honor, I just said I'm offering, since we don't have a jury --
>
> THE COURT: Right.
>
> [DPA]: -- I'm offering simply for you to view it for that purpose --
>
> THE COURT: All right. Well, I'll allow it --
>
> [DEFENSE COUNSEL]: Wait, wait, Judge --
>
> THE COURT: -- with those limitations over objection.

Defense counsel argued that witness statements should be redacted. The DPA agreed to continue the trial to redact the footage. Defense counsel objected to a continuance because Rudersdorf lived in Colorado. The court stated:

> -- so I'm going to allow the evidence. I will -- if you want it redacted, then we can continue this, and the State will redact it or, um, I'll allow the evidence for the limited purpose of impeachment of the testimony and not consider anything else that's not relevant to that on the video.[2]

Rudersdorf ultimately agreed to a continuance so the State could redact the body-worn camera footage. He did not request that his own statements be redacted.

On August 27, 2018, Rudersdorf moved "To Strike Prosecution Rebuttal Case" because what he "did and did not say to the police officers" was "inadmissible absent a valid advisement and waiver of his" Miranda rights.

The motion to strike was heard on August 30, 2018. The State argued that Rudersdorf wasn't in custody — "I liken the interaction between the police and the defendant more to a traffic stop, where a person is temporarily detained, the police officer is trying to determine if -- if anything has gone on." The State also argued "that a lack of Mirandizing him in this situation does not protect the spontaneous -- spontaneous utterances that he made, it doesn't protect the visual observations that you will be able to see as to what happened that day on the video, and it also doesn't protect his lack of speaking, which is one of the reasons I'm introducing the video, is to show that he did not say the things that he represented on the stand, at least in part."

The trial court ruled:

> Well, having reviewed it, and I looked back at the testimony, you know, I guess the thing that the Court is concerned with -- well, number one, I don't know that these

---

2    This would have been permissible because in a bench trial "a judge is presumed not to be influenced by incompetent evidence." State v. Vliet, 91 Hawaiʻi 288, 298, 983 P.2d 189, 199 (1999) (cleaned up).

6

statements were made under interrogation and -- the officers were investigating, and I think the case law is clear that a seizure does not always mean that the person is in custody.

But nevertheless, these -- the defendant testified that he told the officers that he wanted to make a statement, and then the other statement at issue was that he had reported to the officers that his family was threatened and that he very clearly told that to the officers. This was his testimony. He testified to this. In fact -- and, [defense counsel], I think you questioned the officer about whether or not the defendant had told the officer that his family had been threatened by some people.

So I don't -- and there were no objections when the defendant was under cross-examination by the prosecution about the statements being improper because there was no Miranda warnings.

So I'm going to allow the rebuttal testimony. I'm going to deny the motion.

. . . .

THE COURT: All right. And -- and just to be clear, my understanding is what's at issue was that the defendant testified that he indicated to the officers that he wanted to make a statement at the beach, he also reported to them that his family was threatened, that those are the statements that were -- that are at issue. That's what he testified to, but the allegation is those are not -- that's not contained within the body cam video.

The State clarified:

Your Honor, I would like to explain a little bit more about -- I think what I said before and -- about part of what I believe he misrepresented on the stand, it wasn't just that he said, my family was threatened, but during direct and cross, he said that's the reason that he ran off, is because his family had been threatened, he was concerned about their safety, and that's the reason he ran from the police when they had told him three, four times that he wasn't allowed to leave.

When you see that video in its entirety, you'll see that during the first interaction with the police, he did say, they're down there somewhere; they -- they threatened my family. He did say that. And then he continues to interact with the police, where they're having many other conversations. He's asking about, are they going to press charges? There's a lot of other interaction before he says, are they pressing charges, and then he sprints off away from the police.

I think the value of seeing that -- him saying on the stand, I ran away because I was scared for my family, you will see that that is not true when you watch this video, that there were many minutes and lots of interaction that went on between his initial ["]they threatened my family, they're down there somewhere, I'm going to be upset if they get close to my family,["] and then all the interaction that

led toward eventually him sprinting away from the police and them having to chase him across the property.

So I think all of that is valuable for you to see that he misrepresented on the stand.

The trial court denied Rudersdorf's motion.

On March 21, 2019, Rudersdorf moved in limine to strike the State's rebuttal case. The motion was again based on Rudersdorf not being given a <u>Miranda</u> warning. The motion in limine was heard on March 22, 2019, the continued trial date. The DPA argued:

> And I'm offering this DVD also for -- to look at -- make visual observations as to what occurred. That is not protected by Miranda. There was -- you know, Miranda was designed to keep out a statement by the defense I'm offering the DVD so that you can see what happened.
>
> . . . .
>
> Well, you seeing what happened is what will impeach the defendant's testimony when he was on the stand. He got on the stand and he said that he was running because he was scared for his family's safety and running towards his family, as far as he knew was further down the beach. He ran mauka side, not along the beach towards his family, around the mauka side through the hotel grounds and toward the parking lot.
>
> So you making a visual observation of him running opposite the beach toward the parking garage across the entire hotel grounds is going to be a visual observation you can make that's directly in contradiction to what he testified to on the stand and told you that he was -- when he got on the stand and told you that he was running -- he ran because he was scared for his family's safety and they were down at the beach.

The court denied the motion in limine, stating:

> ***I don't believe***, although he was not free to leave, ***that there was custodial interrogation***, and the Court is going to allow the rebuttal and deny the motion. So we can proceed.

(Emphasis added.)

The State recalled Officer Takayama to authenticate the redacted video footage, then offered the footage into evidence as State's Exhibit 1. The court admitted Exhibit 1 into evidence over Rudersdorf's objection. It was played in open court. The

audio included this exchange between Officer Takayama and Rudersdorf:

> [Officer Takayama]: So standard procedure before we ask anybody questions, we advise them of their rights, yeah, so just so you know what your rights are. So you have the right to remain silent. Anything you say can be held against you (inaudible). You have the right to talk to a lawyer for advice before asking you any questions.
>
> [Rudersdorf]: Okay. Am I under arrest?
>
> [Officer Takayama]: No, but it's standard --
>
> [Rudersdorf]: I just want to leave.
>
> [Officer Takayama]: Yeah (inaudible) because we're investigating your theft and assault on another girl over there, so I can't just let you leave.
>
> [Rudersdorf]: Okay.
>
> [Officer Takayama]: So are you going to let me finish or -- yeah, so I got to advise you of your rights first. You have the right to remain silent. Anything you say can be used against you in court -- let's go over here so we're not in the walkway. That's fine. But you're still not free to go so if you don't --
>
> [Rudersdorf]: (Inaudible).
>
> [Officer Takayama]: That's fine, but you're still not free to go. So if you don't want to give us a statement, we have to (inaudible) what they're saying and it's not --
>
> [Rudersdorf]: Okay. I rented --
>
> [Officer Takayama]: You can't talk to me because you wanted to stay silent, yeah. So we're going to stand by for them to get their statement and then we'll go from there. I told you I have to advise you of your rights.
>
> [Rudersdorf]: (Inaudible) my mom and son going down there. If they touch them, I'm going to be very upset. (Inaudible) down here.
>
> [Officer Takayama]: Like I said, I can't ask you any questions if you want to remain silent (inaudible).
>
> [Rudersdorf]: Okay. But I [sic] what I want to do -- I'm here on vacation (inaudible).
>
> [Officer Takayama]: When we're done with our investigation, you have -- until we're done with our investigation, you have to stay here. (Inaudible). *[Officer Cleghorn arrives. Officer Takayama speaks to Officer Cleghorn:]* I've advised him of his rights. He doesn't want to talk.
>
> [Rudersdorf]: No, I -- I didn't say that. I said (inaudible).

> [Officer Takayama]: He wants to remain silent.
>
> [Rudersdorf]: I just want to leave. I just want to leave.
>
> [Officer Takayama]: That's not how it works. You can't just leave.

The video shows Officer Cleghorn obtaining Rudersdorf's information. Rudersdorf says he doesn't have identification on him. He tells Officer Cleghorn his last name is "Swank" (Swank is his wife's surname). Officer Cleghorn leaves after obtaining Rudersdorf's information. Rudersdorf then asks Officer Takayama:

> [Rudersdorf]: (Inaudible). What are they saying?
>
> [Officer Takayama]: Uh, you walked up, pushed a girl off the board (inaudible). You walked up, pushed her over, hit her with it.
>
> [Rudersdorf]: (Inaudible) Do you have any witnesses?
>
> [Officer Takayama]: Yeah, they -- somebody -- you left, came back, spit in one girl's face. Then you kind of left again, came back, tried taking the phone out of another girl's hand and then you slapped her in the face.
>
> [Rudersdorf]: They still have my leash. You have to understand, I'm over here with my family. They come in -- we leave for a little bit. They steal my board, take my leash, you know what I'm saying.
>
> [Officer Takayama]: So you automatically assumed that it was three of them who did it?
>
> [Rudersdorf]: I saw them. They were sitting right next to us.
>
> [Officer Takayama]: So because they were sitting next to you, you're going to walk up and do that to the other two?
>
> [Rudersdorf]: (Inaudible).
>
> [Officer Takayama]: Huh?
>
> [Rudersdorf]: I did assume that, yes.
>
> [Officer Takayama]: Just because they're sitting together, yeah, that's where you screwed up. I mean, going back and grabbing your board, that's one thing, but going back, spitting in another girl's face and then trying to take the other girl's phone is where you went wrong.
>
> [Rudersdorf]: Well, that's not assault.
>
> [Officer Takayama]: Slapping somebody in the face -- that's not assault? You're not leaving. Yeah, exactly.

10

[Rudersdorf]:  Are they going to press charges?

[Officer Takayama]:  He's finding out.

[Rudersdorf]:  Because if they are, I'm going to press charges.

[Officer Takayama]:  For stealing, petty misdemeanor, a surfboard that you had no proof they stole it?

[Rudersdorf]:  They had it, though.

[Officer Takayama]:  They had it but if I walk on the beach, there's a lot of stuff on the beach.  *[At this point, Rudersdorf flees.]*  Hey, get over here.  Get over here.  Get over here.  I'm going to Tase you.  Get over here.  Hey, stop him.  Stop him.  Get over here.  Get over here.  Put your hands behind your back.  Now you made it worse.

[Rudersdorf]:  What did I do?  (Inaudible) guys fucking stole our stuff.

[Officer Takayama]:  Why would you run?

[Rudersdorf]:  Because I'm scared.  You guys are telling me you're going to charge me with assault.

[Officer Takayama]:  I told you we had to find out if you --

[Rudersdorf]:  No, you're being mean and you said I'm charging you with assault.  This is so ridiculous.

[Officer Takayama]:  So you're going to run?

State's Exhibit 1 shows Rudersdorf running mauka, away from the beach where he indicated his family was.

A person in police custody may not be interrogated without first being given Miranda warnings.  State v. Green, 51 Haw. 260, 263, 457 P.2d 505, 507 (1969) (citing Miranda v. Arizona, 384 U.S. 436 (1966)).  The suspect must be told they have a right to remain silent, that anything said could be used against them, that they have a right to the presence of an attorney, and that if they cannot afford an attorney one would be appointed for them.  Kazanas, 138 Hawaiʻi at 34, 375 P.3d at 1272.  Those warnings inform the suspect that the police are not acting solely in the suspect's interest.  Id. at 40, 375 P.3d at 1278.

Police officers do not have to give Miranda warnings "simply because . . . the questioned person is one whom the

police suspect" of having committed a crime. <u>State v. Patterson</u>, 59 Haw. 357, 360, 581 P.2d 752, 754 (1978). A suspect must be advised of their <u>Miranda</u> rights once police have probable cause to arrest. <u>State v. Hewitt</u>, 153 Hawaiʻi 33, 36, 526 P.3d 558, 561 (2023). That is a bright line. <u>Id.</u> But even if police don't have probable cause to arrest, whether a suspect is "in custody or otherwise deprived of their freedom of action for <u>Miranda</u> purposes is to be determined from the totality of the circumstances, objectively appraised." <u>Id.</u> at 36-37, 526 P.3d at 561-62 (brackets omitted). Relevant circumstances include "the place and time of interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and all other relevant circumstances." <u>Id.</u> at 37, 526 P.3d at 562.

"[W]hether the investigation has focused on the suspect" is also a relevant consideration in determining whether a person is in custody for <u>Miranda</u> purposes. <u>State v. Loo</u>, 94 Hawaiʻi 207, 210, 10 P.3d 728, 731 (2000). Under the circumstances of this case, we conclude that Rudersdorf was in police custody when he spoke with Officer Takayama. He was wearing an orange shirt and blue hat, matching a witness description, carrying a bodyboard, and was walking toward Officer Takayama with hotel security.[3] Officer Takayama had focused on Rudersdorf as the suspect in his investigation of the alleged harassment and had begun the <u>Miranda</u> warnings, but was interrupted by Rudersdorf and did not advise Rudersdorf that an attorney would be appointed for him if he could not afford one. A suspect who is not told that an attorney would be appointed for them if they could not afford one has not received an adequate <u>Miranda</u> warning. <u>State v. Valera</u>, 74 Haw. 424, 428 & n.1, 848 P.2d 376, 378 & n.1 (1993).

Whether interrogation has taken place is not measured by the totality of the circumstances; interrogation happens when

---

[3]     The record does not reflect whether hotel security was accompanying Rudersdorf because he reported the theft of his boogie board to them, or because K.W., J.F., and Kuʻulei reported to hotel security that Rudersdorf had assaulted and harassed them.

police know or should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect. Kazanas, 138 Hawaiʻi at 35, 375 P.3d at 1273. "Incriminating response" means "any response — whether inculpatory or exculpatory — that the prosecution may seek to introduce at trial." State v. Skapinok, 151 Hawaiʻi 170, 180, 510 P.3d 599, 609 (2022) (citation and underscoring omitted). Officer Takayama should have know that his conversation with Rudersdorf was reasonably likely to elicit an incriminating response — and it did. See Kazanas, 138 Hawaiʻi at 40, 375 P.3d at 1278 (noting that although police officer intended to calm Kazanas down by making "small talk," "it was 'reasonably likely' that Kazanas would answer the question about how his Halloween went with an incriminating statement about the events leading to Kazanas's arrest.") We conclude that Officer Takayama's dialog with Rudersdorf was "interrogation." Although State's Exhibit 1 had been redacted, it contained incriminating statements made by Rudersdorf after he was subject to custodial interrogation before being given a complete Miranda warning. The trial court erred by admitting the statements into evidence.

The State argues that its Exhibit 1 was admissible as rebuttal evidence because Rudersdorf falsely testified about un-Mirandized statements he said he made to Officer Takayama. But statements made by an un-Mirandized defendant during custodial interrogation "may not be used either as direct evidence or to impeach the defendant's credibility." Kazanas, 138 Hawaiʻi at 34, 375 P.3d at 1272 (citation omitted).

The trial court erred by admitting incriminating statements Rudersdorf made during custodial interrogation before he was given a complete Miranda warning. That is not to say that State's Exhibit 1 was entirely inadmissible. Officer Cleghorn's routine booking questions were not reasonably likely to elicit incriminating responses under the circumstances of this case. Rudersdorf's untruthful response about his last name was not

inadmissible for failure to complete the <u>Miranda</u> warnings.[4]  The footage showing the direction in which Rudersdorf's family left the area of his seizure, and of Rudersdorf running away from Officer Takayama in a different direction, is not "testimonial" and is not barred by the incomplete <u>Miranda</u> warnings.[5]  <u>Cf.</u> <u>State v. Manion</u>, 151 Hawaiʻi 267, 273-74, 511 P.3d 766, 772-73 (2022) (holding that evidence of defendant's performance on standardized field sobriety test is not testimonial and was admissible despite failure to give <u>Miranda</u> warning before administering test).

We vacate the March 29, 2019 "Judgment and Notice of Entry of Judgment" and remand for a new trial.  We need not address Rudersdorf's other points of error.

DATED: Honolulu, Hawaiʻi, May 17, 2024.

On the briefs:

Hayden Aluli,
for Defendant-Appellant.

Richard B. Rost,
Deputy Prosecuting Attorney,
County of Maui,
for Plaintiff-Appellee.

/s/ Katherine G. Leonard
Acting Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge

---

[4]     We express no opinion about whether that statement is otherwise admissible.

[5]     We express no opinion about whether that footage may be subject to other objections.